**Joseph R. BEYRLE, Sr., Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 94–688.

United States Court of Veterans Appeals.

Sept. 6, 1996.

Joseph R. Beyrle, Sr., pro se.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; David W. Engel, Deputy Assistant General Counsel; and Adam K. Llewellyn, Washington, DC, were on the brief, for appellee.

Before NEBEKER, Chief Judge, and HOLDAWAY and STEINBERG, Judges.

STEINBERG, Judge:

The pro se appellant, World War II veteran Joseph R. Beyrle, Sr., appeals an April 29, 1994, Board of Veterans' Appeals (BVA or Board) decision denying an increased (compensable) rating for residuals of a gunshot wound of the right upper extremity [hereinafter residuals] and finding no clear and unmistakable error (CUE) in a May 26, 1947, Department of Veterans Affairs (VA) regional office (RO) final decision. Record (R.) at 4–12. For the reasons that follow, the Court will vacate the Board decision, reverse as to one finding, and remand the case to the Board for readjudication of both claims.

## I.  Background

The veteran served on active duty in the United States Army from September 1942 to November 1945 (R. at 18), and was held as a prisoner of war (POW) by the German government from June 1944 until January 1945 (R. at 41, 47, 49, 123, 241).  Service medical records do not contain any notations with respect to the veteran's having received a gunshot wound to his upper right shoulder. *See* R. at 22–47.  An undated "Personal History" related by the veteran indicated that he had suffered an injury to his upper right arm while a POW.  R. at 32.

An April 1947 VA physical examination report noted that, although the veteran's complaints at that time did not include right-shoulder residuals (R. at 50), the report noted "two elliptical shaped, slightly elevated, well healed cicatrices" of the "right deltoid area" which were "not bound down" and had "no disturbance of underlying muscular function" and were "the residual of superficial through and through bullet wound" which had been received while he was in the German prison camp.  R. at 54.  The diagnosis included "[c]icatrices, healed, right deltoid area, residual through and through bullet wound".  R. at 56.  In a May 1947 decision, a VA regional office (RO) granted service connection for "scars, right deltoid area" and assigned a 0% rating.  R. at 59.

At a May 1949 VA examination, the veteran's complaints did not include residuals in the deltoid area, and the diagnosis did not include a reference to the scar in the deltoid area or any residuals of the deltoid area.  R. at 68, 73.  A neuropsychiatric examination report of the same date noted that the veteran had been "shot in the upper arm in the P.O.W. camp".  R. at 74.  Written notes accompanying the May 1949 examination reported "normal range of motion" as to the veteran's right shoulder.  R. at 77.  A June 1949 RO decision noted that the current VA examination did not show any change of conditions affecting, inter alia, the previously awarded 0% rating for "wound[ ], slight, r[ight] deltoid".  R. at 82–83.

In April 1952, the veteran sought an increased rating (R. at 87) and provided a March 1952 medical report from Dr. Teifer

(R. at 89).  The report stated: "Examination of the right shoulder shows a penetrating type of scar which is approximately one inch in diameter, indicating that the foreign body penetrated the [d]eltoid [m]uscle of the right shoulder.  [The veteran] has pain on motion of the affected shoulder."  R. at 89.  On a June 1952 VA medical examination report, the veteran stated that his present complaints included soreness to his right shoulder and arm.  R. at 91.  The physician noted the existence of two "10cm flat scars over [the] r[igh]t deltoid lateral to r[igh]t shoulder" and reported: "[The veteran h]as no muscle atrophy in [his] shoulder but alleges pain on extremes of motion.  [He h]as full motion [of his] r[igh]t shoulder [with] no crepitation."  R. at 93.  A September 1952 RO decision again denied an increase in the assigned 0% disability rating.  R. at 104.

A VA medical examination report in February 1982 recorded the veteran's complaints of, inter alia, "pain in arms [and] hands".  R. at 108.  An examination of the musculoskeletal system included a reference to two "faint[,] [1–inch,] pliable[,] non-adherent scars of [his] upper r[igh]t arm over deltoid muscle[, three inches] below [the] acromion."  R. at 110.  (Acromion is "the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder", DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 20 (28th ed. 1994) [hereinafter DORLAND'S].)  The report noted a normal range of motion of the shoulders and elbows with "no loss of muscle tone or strength".  R. at 110.  An October 1982 RO decision denied, inter alia, an increased rating for residuals of right deltoid-area scars.  R. at 118–19.

A March 1983 VA physical examination report noted a 2¾-inch diagonal scar on the veteran's right arm "over [the] deltoid [with a ¾ inch] bridge of unscarred skin (thru [and] thru wound)".  R. at 153.  A VA x-ray report of the veteran's right shoulder in September 1983 revealed "proliferative changes at the acromio-clavicular [ (AC) ] joint".  R. at 136–37.  A VA ex-POW protocol consultation report of the same month included a diagnosis of "[s]car[,] SFW [shell fragment wound of the] r[igh]t arm over r[igh]t deltoid".  R. at

143. A December 1983 RO decision, inter alia, denied an increased rating for residuals of the deltoid-area scar. R. at 159–64.

In May 1991, the veteran's representative submitted a letter to the RO claiming CUE in the May 1947 RO decision and subsequent decisions as to the veteran's right deltoid. R. at 191–93. In its May 1992 decision, the RO, noting that the provisions of 38 C.F.R. §§ 4.56(b) and 4.72 had been considered in its 1947 RO decision, denied the veteran's CUE claim. R. at 199–201. At a November 1992 hearing on appeal to the Board, the veteran's representative argued that the evidence showed that the veteran had a through-and-through gunshot wound and that the RO had failed to properly apply the regulations which "required a rating for moderate injury for muscle group of the deltoid and [that its] failure to do so was prejudicial to the veteran". R. at 235. A February 1993 Board decision, inter alia, remanded the CUE claim to the RO for it to provide the veteran with "a VA special orthopedic examination to determine the nature and extent of the veteran's service-connected residuals of a gunshot wound of the right deltoid." R. at 260. The Board further directed:

The report of examination should contain a complete account of all manifestations of residuals of a gunshot wound to the right deltoid found to be present. It is requested that the examiner review the various examination reports on file pertaining to the right deltoid wound and attempt to reconcile the findings so as to determine whether the wound resulted in muscle damage or was superficial and without muscle damage.... The report of examination should contain a complete rationale for all conclusions and opinions expressed.

R. at 260.

The veteran submitted a May 1993 private orthopedic examination report prepared by Dr. Mead; the report related that the veteran had been shot in the right shoulder while he was a German POW, that the bullet "went in the front [of his shoulder] and came out the back", and that the veteran had stated that "he has had trouble with both shoulders ever since that episode". R. at 263. Examination reportedly revealed "quite a bit of shoulder girdle atrophy" and two "scar[s, each 1½-inch long] in the area of the lateral aspect of the [right] shoulder". Ibid. The report stated:

It appears [that the bullet] would go through a portion of the deltoid muscle. His shoulder has forward flexion to about 110 degrees, but has pain at the extremes.... Any movement of the shoulder causes him quite a bit of discomfort. He has AC arthritic change as well. He has no gross clinical instability of the shoulder.... There[ ]does appear to be some generalized weakness of the shoulder, especially with internal external rotation of the rotator cuff but equal right versus left.... He has about 3/4's now [sic] mobility of the shoulder in all plains [sic]. He has tenderness over the AC joint as well.

R. at 263–64. The impression was "[r]emote gunshot wound [of the] right shoulder", "[o]steoarthritis of the shoulders and [AC] joints[,]" and "[m]ild joint contractures of the capsule". R. at 264. The physician noted that he thought "with the treatment necessary that [the veteran] would lose some deltoid function[,]" that "[i]t appeared[,] however[,] to involve only about 1/3[ ] of the deltoid muscle[,]" and that the veteran "may always after these [capsules] healed developed [sic] a sympathetic degree of contractures bilaterally". Ibid. As to the question of how much of the veteran's condition was due to the gunshot wound and how much to "wear and tear", the physician noted that it was "very hard" for him to state but that he believed "the gunshot did affect the deltoid function to a degree" and that the veteran "definitely has some weakness and arthritic change in the shoulder". Ibid.

On a July 1993 examination report, a VA physician noted that the veteran's scar in the deltoid area "is a thin, white line" and "is an extremely superficial wound". R. at 268. He reported:

[The scar] is at a point of entry, point of exit approximately no more than three inches in length with an island of normal tissue in between. This is, to all intents and purposes, a penetration of the subcutaneous tissue. In exit, a few muscle fibers

may have been severed but the degree of that injury is, I believe, minimal.

. . . .

No evidence of pain in the wound itself, but there is some degenerative disease in the shoulder. This may be degenerative disease unassociated with any injuries that he may have sustained in [WWII].

R. at 268. The diagnosis included "no muscle wasting of the deltoid" and "no significant degeneration or loss of tissue or penetrating injury causing severe loss of function of the deltoid muscle". *Ibid.* The physician noted that "the muscle injury is so small that I do not believe it has a serious bearing on the deltoid muscle or the use of that shoulder." *Ibid.* The examination "show[ed] minimal invasion of the deltoid muscle". *Ibid.* A VA x-ray report of the same date for the right shoulder revealed: A "prominent caudal spurring at the distal clavicle which could impinge the rotator cuff as could the spur formation at the acrominion process. However, no other specific lesion is detected." R. at 269. The impression was "spur development at the right AC joint and rotator cuff impingement is possible." *Ibid.*

In July 1993, an RO decision on remand denied an increased rating for the residual of the right-shoulder gunshot wound and denied the CUE claim. R. at 272–75. In August 1993, the RO issued a Supplemental Statement of the Case identifying the CUE claim as the issue on appeal. R. at 278. A September 1993 letter from the veteran to the RO stated that he disagreed with the RO's July 1993 decision "denying service connection for a through[-]and[-]through bullet wound to upper right shoulder", and noted that he was planning to "file a statement of [the] case [sic] through my service representative". Supplemental R. at 4. (This letter constitutes the veteran's Notice of Disagreement as to the compensable-rating residuals claim now on appeal. *See Beyrle v. Brown,* 9 Vet.App. 24, 28–29 (1996).)

In the April 1994 BVA decision here on appeal, the Board found that during his active military service "the veteran sustained a gunshot wound to the right shoulder" and that the "bullet pierced the skin of the shoulder, followed a short track between the skin

and the deltoid muscle and exited." R. at 6. The Board also found that there was no "through and through wound of the right deltoid muscle"; that there was "no more than a slight injury to the right deltoid muscle"; that the "right shoulder is currently manifest by small asymptomatic scars"; and that referral for consideration of extraschedular ratings under 38 C.F.R. § 3.321(b)(1) (1993) was not warranted. R. at 6. The Board concluded that the criteria for a compensable rating for residuals had not been met, and that previous RO decisions assigning noncompensable ratings for residuals did not contain CUE. R. at 6.

## II. Analysis

### A. CUE as to Prior RO Decisions

■ Section 3.105(a) of title 38, Code of Federal Regulations, provides:

Where evidence establishes [CUE], the prior decision will be reversed or amended. For the purpose of authorizing benefits, the rating or other adjudicative decision which constitutes a reversal of a prior decision on the grounds of [CUE] has the same effect as if the corrected decision had been made on the date of the reversed decision.

38 C.F.R. § 3.105(a) (1995). A claim of CUE is a collateral attack on a final RO decision. *See Smith (William) v. Brown,* 35 F.3d 1516, 1521 (1994); *Duran v. Brown,* 7 Vet.App. 216, 223–24 (1994).

In *Russell v. Principi,* this Court defined CUE as follows:

Either the correct facts, as they were known at the time, were not before the adjudicator or the statutory or regulatory provisions extant at the time were incorrectly applied.... [CUE] is the sort of error which, had it not been made, would have manifestly changed the outcome ... [, an error that is] undebatable so that is can be said that reasonable minds could only conclude that the original decision was fatally flawed.

*Russell,* 3 Vet.App. 310, 313 (1992) (en banc).

■ For a claim of CUE to be reasonably raised, the claimant must provide some degree of specificity as to what the alleged error is, and, unless it is the kind of error

that, if true, would be CUE on its face, "persuasive reasons must be given as to why the result would have been *manifestly* different but for the alleged error". *Fugo v. Brown*, 6 Vet.App. 40, 44 (1993). On appeal of a BVA determination that there was no CUE in a prior RO decision, the Court's review is limited to determining whether the Board's conclusion is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (38 U.S.C. § 7261(a)(3)(A)) and whether it is supported by an adequate statement of "reasons or bases" (38 U.S.C. § 7104(d)(1)). *See Eddy v. Brown*, 9 Vet.App. 52, 57 (1996); *Glynn v. Brown*, 6 Vet.App. 523, 530–31 (1994); *Damrel v. Brown*, 6 Vet.App. 242, 246 (1994); *Russell*, 3 Vet.App. at 315.

▬ The Board is required by 38 U.S.C. § 7104(d)(1) to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record, including its denial of any assistance specifically sought by the claimant. *See Godwin v. Derwinski*, 1 Vet.App. 419, 427 (1991). The statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See Simon v. Derwinski*, 2 Vet.App. 621, 622 (1992); *Masors v. Derwinski*, 2 Vet. App. 181, 188 (1992); *Gilbert v. Derwinski*, 1 Vet.App. 49, 57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of all material evidence favorable to the veteran. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd*, 78 F.3d 604 (Fed.Cir.1996) (table); *Gabrielson v. Brown*, 7 Vet.App. 36, 39–40 (1994); *Gilbert, supra.*

▬ The veteran asserts CUE in prior final RO decisions of May 1947, June 1949, September 1952, October 1982, and December 1983. R. at 191–92, 235; *see also* Brief (Br.) at 17. He asserts, in effect, that the evidence of record before the RO at the time of each of these prior decisions, specifically "the April 1947 and July 1952 VA examinations, established through[-]and[-]through

gunshot wound injury of his right deltoid musculature" and that he was therefore entitled to a rating for moderate injury to the right deltoid muscle pursuant to "38 C.F.R. [§ ] 4.56(b)" and "38 C.F.R. [§ ] 4.72". R. at 192; *see* R. at 234–35; *see also* Br. at 17, 18. The veteran's contention that the RO misapplied 38 C.F.R. §§ 4.56 and 4.72 as interpreted by this Court's precedent—specifically, that the diagnosis of a through-and-through bullet wound in April 1947 and a March 1952 diagnosis of a penetrating muscle wound require a compensable rating (*see* R. at 191–92, 235; *see also* R. at 56, 89)—gives rise to a valid CUE claim. *See Russell*, 3 Vet.App. at 313; *Myler v. Derwinski*, 1 Vet.App. 571 (1991); *cf. Eddy*, 9 Vet.App. at 57–58.

Moderate muscle damage of the deltoid muscle is rated as 20% disabling under 38 C.F.R. § 4.73, Diagnostic Code (DC) 5303 (1995). The Schedule for Rating Disabilities in existence from 1947 through 1965 provided, as it does now in 38 C.F.R. § 4.47 (1995), in a section pertaining to the musculoskeletal system, entitled "Effect of missiles", that "[t]hrough and through wounds and other wounds of the deeper structures almost invariably destroy parts of muscle groups". SCHEDULE FOR RATING DISABILITIES 14–15 (1945) [hereinafter SCHEDULE]. Another section of that Schedule (currently 38 C.F.R. § 4.56(b) (1995)) provided:

*Factors to be Considered in the Evaluation of Disabilities Residual to Healed Wounds Involving Muscle Groups Due to Gunshot or Other Trauma.*

. . . .

(2) Moderate Disability of Muscles.

*Type of injury.* **Through and through or deep penetrating wound of relatively short track by single bullet or small shell or shrapnel fragment are to be considered as of at least moderate degree.** Absence of explosive effect of high velocity missile and of residuals of debridement or of prolonged infection.

*History and complaint.* Service department record or other sufficient evidence of hospitalization in service for treatment of wound. Record in file of consistent complaint on record from first ex-

amination forward, of one or more of the cardinal symptoms of muscle wounds ... particularly fatigue and fatigue-pain after moderate use, affecting the particular functions controlled by injured muscles.

*Objective findings.* Entrance and (if present) exit scars linear or relatively small, and so situated as to indicate relatively short track of missile through muscle tissue; signs of moderate loss of deep fascia or muscle substance or impairment of muscle tonus, and of definite weakness or fatigue in comparative tests. (In such tests the rule that with strong efforts, antagonistic muscles relax is to be applied to insure validity of tests.)

SCHEDULE at 18–19 (boldface-italic emphasis added); *see also* 38 C.F.R. 4.56(a), (b). Finally, a note under the title "Muscle Injuries", currently 38 C.F.R. § 4.72 (1995), provided:

In rating disability from injuries of the musculoskeletal system, attention is to be given first to the deeper structures injured, bones, joints, and nerves. A compound comminuted fracture, for example, with muscle damage from the missile, establishes severe muscle injury, and there may be additional disability from malunion of bone, ankylosis, etc. The location of foreign bodies may establish the extent of penetration and consequent damage. It may not be too readily assumed that only one muscle, or group of muscles is damaged. *A through and through injury, with muscle damage, is always at least a moderate injury, for each group of muscles damaged.*

SCHEDULE, note, at 44–45 (emphasis added).

The appellant contends that *Myler* held that a through-and-through wound with muscle damage is always rated at least moderate. Br. at 16. In *Myler,* this Court found CUE in a previous November 1953 RO decision's failure to apply properly the predecessors of 38 C.F.R. § 4.72 and 38 C.F.R. § 4.56(b) for muscle injury to a veteran's thigh. *Myler,* 1 Vet.App. at 574. In *Myler,* a VA medical examination had found at the time of the prior RO decision:

Penetrating GSW [gunshot wound], right thigh. . . . [R]ight leg with residuals of penetrating GSW, right mid thigh, without atrophy, nerve, or vessel injury. . . . Apparently entered at the lower border of the right hamstring group, coursed anteriorly thru the lateral border of the quadraceps [sic] group at mid rt. thigh. No depression, no evidence of muscle atrophy. . . . *[F]unction, right thigh muscle not impaired by GSW.* No nerve or vessel injury.

*Id.* at 572 (emphasis added). The Court held, based on this diagnosis and 38 C.F.R. §§ 4.72 and 4.56(b), that the veteran was entitled to "a rating 'of at least a moderate degree' ... of disability for the 'through and through' gunshot wound to [the] muscle". *Id.* at 574. Hence, the Court in *Myler* interpreted 38 C.F.R. § 4.72 and § 4.56(b) as providing that "a 'through and through' [apparently muscle] wound by a 'single bullet or small shell or shrapnel fragment' was to be rated as of at least moderate degree of disability" regardless of whether the muscle sustained any permanent damage. *Ibid.*

In the instant case, the evidence of record *prior to 1952* contains no indication that the gunshot wound penetrated muscle tissue or resulted in muscular damage. The record does contain a diagnosis of "[c]itatrices, healed, right deltoid area, residuals through and through bullet wound". R. at 56. A "through and through" bullet wound that does not result in muscle damage fails to meet the criteria in 38 C.F.R. § 4.73 for a moderate rating under DC 5303 and in 38 C.F.R. § 4.72. Additionally, § 4.56 applies to wounds "involving muscle groups", requiring a moderate rating for "through and through or deep penetrating wounds". *See* 38 C.F.R. § 4.56(b). Although the veteran's injury was diagnosed as a "through and through bullet wound" (R. at 56), at the time of the May 1947 and June 1949 RO decisions there was no evidence of a through-and-through gunshot wound involving muscle tissue, which § 4.56 appears to require. Therefore, the BVA decision finding that the RO decisions of May 1947 and June 1949 were not the products of CUE was not arbitrary and capricious. *See Eddy* and *Russell,* both *supra.*

However, in the March 1952 medical report, Dr. Teifer stated: "Examination of the right shoulder shows a penetrating type of scar which is approximately one inch in diameter, indicating that a foreign body penetrated the [d]eltoid [m]uscle of the right shoulder." R. at 89. The April 1947 VA examination diagnosed the veteran as having had a through-and-through bullet wound to the "right deltoid area". R. at 56. In this case, then, as in *Myler*, the veteran had a diagnosis of a "through and through" penetrating muscle wound at the time of the relevant RO decision. Additionally, neither veteran was diagnosed with muscle damage or atrophy resulting from the gunshot wound. (The Court notes that the RO in *Myler* apparently had provided a compensable rating for a moderate muscle injury involving muscles in proximity to those that were the subject of the CUE claim. This possible distinction does not affect *Myler*'s interpretation of § 4.56, however, because that regulation does not require muscle damage.)

The BVA found that the veteran's scars indicate that the bullet went "through and through the skin, and not through and through the underlying muscles" and that therefore the injury was correctly rated under 38 C.F.R. § 4.118, DC 7805 (1993) (scars) as opposed to 38 C.F.R. § 4.73(DC) 5303 (1993) (muscle injuries). R. at 10. The Board stated that "[e]ven at the time of the May 1947 RO determination, the rating schedule required muscle damage" in order to award a compensable rating under DC 5303. *Ibid.* The Board also stated that the "record shows that the service-connected shoulder wound produced asymptomatic scars and no more than slight muscle impairment" and that therefore there was no error in the prior RO decisions. *Ibid.* The record at the time of the 1952 RO decision, however, clearly contains medical evidence—in the form of Dr. Teifer's statement that the bullet had penetrated the deltoid muscle—in support of a through-and-through penetrating muscle wound with little or no evidence to the contrary. If the RO had applied the predecessors of § 4.56(b) as interpreted by *Myler*, then the veteran would apparently have been entitled to a moderate rating for muscle injury as a residual of his gunshot wound The Board decision must be vacated and the matter remanded for this application to be made by the Board in the first instance.

The Court notes that the current BVA decision impermissibly intermingled the two issues before the Board. The Board made no effort to separate its discussion of the veteran's CUE claim and his claim for an increased rating, as required by *Russell*, 3 Vet.App. at 313–14 (determination of CUE must be based on record and law in existence at time of prior RO decision). Rather, the decision outlined all the evidence of record together, including the two 1993 examinations, before denying in a single step the veteran's CUE claim and his current claim for an increased rating. These later diagnoses were irrelevant as to the Board's decision on CUE in the previous RO decisions. *See Russell, supra.* Furthermore, the Board failed to discuss, or even note, this Court's precedential opinion in *Myler* that had been issued by the Court approximately two-and-one-half years prior to the Board decision here and which both involves very similar facts and interprets authoritatively the relevant regulations. The Court thus holds that the BVA failed to provide an adequate statement of reasons or bases for its rejection of the veteran's CUE claim as to the 1952 RO decision. *See Simon, Masors,* and *Gilbert,* all *supra.* The Court will thus remand the CUE claim to the Board for it to consider and discuss all the evidence before the RO in 1952, in a manner separate from the current evidence, and analyze it in terms of the holding of *Myler,* regarding § 4.56(b). Moreover, the Board should discuss, based on appropriate medical evidence, the required characteristics of a through-and-through wound, that is, whether a through-and-through muscle wound requires more than penetration of the muscle.

### B. Current Claim for Increased Rating

■ A claim for an increased rating is a new claim, not subject to the provisions of 38 U.S.C. §§ 7104(b) and 7105(a) prohibiting reopening for previously disallowed claims except upon new and material evidence. *See Proscelle v. Derwinski,* 2 Vet.App. 629, 631–32 (1992); *Suttmann v. Brown,* 5 Vet.App.

127, 135 (1993). The Court reviews BVA factfinding under a "clearly erroneous" standard; "if there is a 'plausible' basis in the record for the factual determinations of the BVA, . . . [the Court] cannot overturn them". *Gilbert*, 1 Vet.App. at 53, 38 U.S.C. § 7261(a)(4).

The veteran is currently service connected for right-shoulder scars resulting from the gunshot wound, and is rated under 38 C.F.R. § 4.118, DC 7805, which provides for basing a rating on the limitation of function of the part affected. The Board found that neither the May 1993 private orthopedic examination nor the July 1993 VA examination showed that the scars limited shoulder function to a compensable degree. R. at 9. Specifically, the Board noted that the private physician "did not indicate that the scars limited shoulder function and he could not distinguish shoulder limitations due to the wound from the limitations associated with non[-]service[-]connected causes"; and that the VA examiner "was empathic [sic] that the wound had no serious affect on the muscle or the shoulder". *Ibid.* However, the Court finds that the Board explained the evidence that did not support the veteran's claim while failing to discuss the evidence in support thereof. *See Caluza* and *Gabrielson*, both *supra.* The private physician actually stated that the veteran "has about 3/4's now [sic] mobility of the shoulder in all plains [sic]" and that it was "very hard" to distinguish the effects of the gunshot versus "wear and tear", but that he believed "the gunshot did affect the deltoid muscle to a degree". R. at 263–64. The VA examiner also stated that there was "no significant degeneration or loss of tissue or penetrating injury causing *severe* loss of function of the deltoid muscles" and that he did not believe that the gunshot wound had *"a serious bearing* on the deltoid muscle or the use of [the right] shoulder", thus indicating that the wound had some bearing on the muscle's use and had caused some loss of the muscle's function. R. at 268 (emphasis added).

The Board found that the veteran was not entitled to an increased rating for his service-connected scars under DCs 7803 and 7804. R. at 9. These DCs provide that a 10%

rating shall be granted if scars are "superficial, poorly nourished, with repeated ulceration" (DC 7803) or if they are "superficial, tender and painful on objective demonstration" (DC 7804). Hence, a compensable rating for the scars would not appear to be indicated if the veteran were eligible to be rated only under DC 7803 or 7804 relating to scars. However, as noted in part II. A., above, the evidence of record may warrant a compensable rating for muscle injury under DC 5303.

As previously noted, the Board erroneously commingled its discussions of the CUE claim and the increased-rating claim. That was not the extent of its reasons-or-bases errors. In addition, as to the current rating-increase claim, the BVA misstated physician findings and failed to consider adequately this Court's binding precedent in *Myler, supra.* The Board correctly noted that 38 C.F.R. § 4.72 provided, as to "Rating muscle injuries", that "[a] through and through injury, with muscle damage, is always at least a moderate injury". R. at 10. The Board then found:

> The scars are so situated as to indicate that the missile did not actually go through muscle tissue. The scars indicate that the bullet went through and through the skin, and not through and through the underlying muscles.
>
> . . . .
>
> Although the veteran's private physician has expressed an opinion that there is muscle injury, neither his findings [n]or opinion have been corroborated on any other medical examination accorded the veteran. All the other examinations support the finding that there is *little if any* muscle injury.

*Ibid.* (emphasis added).

However, although section 4.72 appears to require "muscle damage", no minimum degree of "muscle damage" is specified; rather, it appears that once a through-and-through muscle wound is found to contain "muscle damage" the rating becomes automatic. In that regard, the 1993 VA and private examinations focused on by the Board appear to support a finding of some muscle damage, contrary to the Board's findings. In fact, the

Board appeared to contradict itself by stating that other physicians have not corroborated the veteran's private physician's findings of muscle injury, but then stated that other physicians have found "little if any muscle injury", suggesting that some physicians have found muscle injury. The Court notes that "little" injury is still injury. The May 1993 private physician report stated that "the gunshot did affect the deltoid function to a degree" (R. at 264), and the July 1993 VA physician report noted that "a few muscle fibers may have been severed" (R. at 269). Regardless of the Board's finding as to muscle damage and the applicability of § 4.72, however, § 4.56(b) as interpreted by *Myler* clearly does not require muscle damage if there is a through-and-though wound (that is, "a 'through and through' wound [to a muscle] by a 'single bullet or small shell or shrapnel fragment' [is] to be rated as of at least moderate degree of disability", *Myler*, 1 Vet. App. at 574).

█ The fact that the veteran suffered a through-and-through gunshot wound appears to be uncontradicted. The veteran's wound was twice specifically diagnosed as through and through (R. at 56, 153), several physicians note two distinct scars (R. at 56, 93, 110, 263), and both 1993 examinations referenced a point of entry and exit (R. at 263, 268). Additionally, the most recent medical examinations both mention some muscle penetration or severing of muscle fibers. R. at 263–64, 238. This evidence would appear to provide strong support for finding that the veteran has a through-and-through muscle wound or a through-and-through wound involving a muscle group which, pursuant to § 4.56, is to be rated as moderate and thus as 20% disabling under DC 5303.

In concluding that the gunshot wound was through and through the skin rather than muscle, the Board appeared to rely on the 1993 VA examination, which did not support such a finding (or perhaps on its own unsubstantiated medical findings contrary to this Court's precedent in *Colvin v. Derwinski*, 1 Vet.App. 171, 175 (1991)). The Court finds that such finding does not have a plausible basis in the record. *See Gilbert, supra.* Beginning in 1947 when the veteran was first

diagnosed with a through-and-through bullet wound (R. at 56), the record does not contain a medical opinion to the effect that the bullet was *merely* through and through the skin. Dr. Teifer's March 1952 medical report found "that the foreign body penetrated the [d]eltoid [m]uscle of the right shoulder" (R. at 89); the 1982 VA examination noted the veteran's scars, but made no comment as to whether or not the bullet penetrated the deltoid muscle (R. at 118–19); the March 1983 VA examination noted a through-and-through wound, but did not discuss muscle damage (R. at 153); the May 1993 private examination noted that "[it] appears [that the bullet] would go through a portion of the deltoid muscle" (R. at 263–64); and the July 1993 VA examination reported: "This is, to all intents and purposes, a penetration of the subcutaneous tissue. In exit, a few muscle fibers may have been severed but the degree of that injury is, I believe, minimal" (R. at 268).

On the basis of the foregoing discussion, the Court will thus reverse as clearly erroneous the BVA's factual finding that the wound was a through-and-through wound only of the skin. Further, the Court holds that the BVA, in denying the veteran's current increased rating-claim, failed to provide an adequate statement of reasons or bases as to its rejection of the material evidence favorable to the veteran. *See Simon, Masors,* and *Gilbert,* all *supra.* Accordingly, the Court will vacate the decision and reverse as to the clearly erroneous factual finding and will remand the current increased-rating claim to the Board for it to provide an adequate statement of reasons or bases in evaluating the evidence favorable to the veteran, including a full discussion as to both 1993 examinations, the requirements for a through-and-through muscle wound, and 38 C.F.R. §§ 4.56(b) and 4.72 as interpreted by *Myler* and as they apply to this case. Additionally, on remand the Board should comport with the Court's holding in *Colvin* by relying only on independent medical evidence in support of its conclusions.

## III. Conclusion

On consideration of the foregoing, the record on appeal, and the briefs of the parties,

the Court vacates the April 29, 1994, BVA decision as to both claims, reverses the Board finding identified above as to the nature of the through-and-through wound based on the current record, and remands for expeditious readjudication of both claims, on the basis of all applicable law and regulation, *see Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991), and issuance of a new decision supported by an adequate statement of reasons or bases—all consistent with this opinion and in compliance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–466, § 302, 108 Stat. 4645, 4658 (1994) (requiring Secretary to provide for "expeditious treatment" for claims remanded by BVA or the Court). *See Allday v. Brown,* 7 Vet.App. 517, 533–34 (1995). On remand, the claimant will be free to submit additional evidence (to the extent appropriate) and argument on the remanded claims. *See Quarles v. Derwinski,* 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board decision is mailed to the appellant.

REVERSED IN PART; VACATED AND REMANDED IN PART.