# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 99-1461

Maureen T. Dobbin, Appellant,

v.

Anthony J. Principi,
Secretary of Veterans Affairs, Appellee.

On Appeal from the Board of Veterans' Appeals

(Decided     December 11, 2001   )

*John S. O'Dowd* was on the brief for the appellant.

*Leigh A. Bradley*, General Counsel; *Ron Garvin*, Assistant General Counsel; *Jacqueline M. Sims*, Deputy Assistant General Counsel; and *Jenny Y. Yue* were on the brief for the appellee.

Before FARLEY, HOLDAWAY, and GREENE, *Judges*.

HOLDAWAY, *Judge*: The appellant, Maureen T. Dobbin, appeals from a July 1999 decision of the Board of Veterans' Appeals (BVA or Board) which determined that a June 1990 Board decision that denied her claim for service connection for the cause of her husband's death and entitlement to dependency and indemnity compensation (DIC) on the basis of 38 U.S.C. § 351 (now § 1151) did not contain clear and unmistakable error (CUE). The Court has jurisdiction of the case under 38 U.S.C. § 7252(a). For the following reasons, the Court will affirm the decision of the Board.

## I. FACTS

The veteran, William B. Dobbin, served on active duty from October 1950 to April 1952. During service, his left elbow was shattered as a result of a gunshot wound. The diagnosis was "fracture, compound, comminuted, left, distal humerus and proximal radius and ulna with ulna nerve involvement." Record (R.) at 35. His residuals included a flail elbow joint and ulnar nerve damage.

X-rays revealed multiple small metallic densities in the soft tissues and in the elbow joint. From June 1951 to December 1951, the veteran was treated and underwent surgery for the wounds in the left elbow.

In January 1952, the veteran applied for service connection for the residuals of the gunshot wounds in the left elbow. In May 1952, he underwent a VA examination. The examiner noted that the veteran's left shoulder had no evidence of osseous or articular pathology and that it had not retained metallic foreign bodies. As for the veteran's left elbow, the examiner noted that there was complete disorganization of the elbow with loss of the normal contours and architecture and with absence of considerable parts of the condyles of the humerus and of the proximal ends of the radius and ulna. The left elbow disability was attributed to the gunshot wounds with associated fractures. In June 1952, a VA regional office (VARO) granted the veteran a temporary 100% rating for a period of hospitalization, and a 60% rating from October 1, 1952, for the residuals of the left elbow injury. In September 1964, the veteran was diagnosed with rheumatoid arthritis, with secondary anemia. That same month, he claimed to have arthritis as a result of the gunshot wounds. The veteran submitted several doctors reports in support of his claim. One report, dated October 1964, was from Dr. William Pasquariello. Dr. Pasquariello diagnosed the veteran with rheumatic arthritis and stated that "[t]he possibility of this rheumatoid arthritis having a traumatic origin (gunshot wound) must be very seriously considered." R. at 99. In another report, dated the same month, Robert P. Gerety, M.D., opined that the veteran's rheumatoid arthritis could be secondary to his military service. In November 1964, the VARO denied the veteran's claim for service connection for rheumatoid arthritis because there was no basis for concluding that the rheumatoid arthritis, which was initially manifested in 1964, was related to service. The veteran appealed. In March 1966, the Board affirmed the VARO denial.

At a September 1978 VA examination, the veteran was diagnosed with residuals of gunshot wounds in the left elbow with loss of use of the left upper extremity and generalized advance rheumatoid arthritis. The degree of disability was noted to be severe, complete, and irreversible. In November 1978, the VARO granted to the veteran a special monthly compensation for loss of the use of one hand. In January 1979, the veteran was diagnosed with advanced rheumatoid arthritis in the right upper extremity with loss of use of the right upper extremity. The degree of disability was

noted to be severe with marked ulnar neuropathy with motor, sensory, and reflex changes in the left with subsequent atrophy and disuse of this upper extremity. The VARO increased the veteran's special monthly compensation for loss of use of non-service-connected paired extremity in February 1979.

In September 1986, the veteran was hospitalized. He received consultations regarding infectious disease and oral surgery. The impressions were possible abscess or pseudoaneurysm, right proximal forearm, renal amyloidosis with end-stage renal disease, chronic active deforming rheumatoid arthritis, and resolving right preauricular facial abscess. The discharge diagnoses were hematoma adjacent to dialysis fistula and renal amyloidosis with uremia. In December 1986, the veteran underwent "resections of the right forearm bovine and fistula, venous anastomosis, pseudoaneurysm." R. at 401-402. In January 1987, the veteran was diagnosed with bleeding dialysis fistula, renal amyloidosis with uremia, chronic active deforming rheumatoid arthritis, and angina by history. In February 1987, the veteran underwent insertion of bovine AV fistula, right brachialary to right axillary vein; ligation of distal forearm loop AV fistula, right forearm; excision of infected venous end of loop AV fistula; right forearm; and excision of infected venous end of loop AV fistula with ligation of vein. The discharge diagnoses were "infected bleeding right forearm arterial venous fistula," chronic active deforming rheumatoid arthritis, renal amyloidosis with uremia, and angina. R. at 406-407.

In March 1987, the veteran's disability was reevaluated pursuant to new legislation, and the VARO granted the veteran additional compensation. In November 1987, the veteran was admitted to a VA hospital for emergency care. He received hemodialysis. Despite efforts to treat him, the veteran died on the day of admission. The final diagnoses included fluid overload with bilateral hydrothorax, hypoxemia, and hypercapnia; chronic active deforming rheumatoid arthritis; renal amyloidosis with uremia; and bronchitis. The death certificate noted that the immediate cause of death was uremia that was due to or as a consequence of renal amyloidosis and rheumatoid arthritis that had its onset approximately 25 years prior to death. Angina and hemodialysis were listed as other significant conditions or environmental factors.

In November 1987, the appellant, the veteran's widow, filed a VA claim seeking service connection for the cause of the veteran's death, which she asserted was related to his service-

connected gunshot wound. The appellant later expanded her claim to include a claim for DIC based on 38 U.S.C. § 1151 and her allegations that her husband's death resulted from a VA misdiagnosis of his infection in August 1986 and that the infection resulted from a contaminated water supply used in the dialysis unit at the Tucson, Arizona, VA Medical Center. She submitted a newspaper article entitled "Tucson VA patient died after unsterile dialysis." The article reported that in November 1985, one patient died and five others became ill after being treated with contaminated water at the Tucson VAMC. She also submitted medical articles that related the techniques of debridement and posted a relationship between retained lead fragments in joints and the development of arthritis.

In October 1989, the VARO determined that the veteran's death was not caused by the VA medical or surgical treatment, but by renal amyloidosis and rheumatoid arthritis. Consequently, the VARO denied the appellant's claim. In June 1990, the Board again denied the appellant's claims for service connection for the cause of the veteran's death and DIC benefits.

In March 1993, the appellant submitted evidence to reopen her claim for service connection for the cause of the veteran's death. Among the newly submitted evidence were letters from Dr. Stephen M. Seltzer and Dr. Robert P. Gerety. In his November 1993 letter, Dr. Seltzer stated that it was reasonable to suggest that the veteran's "end-stage renal disease, which ultimately led to his death, could have been the result of chronic lead poisoning from his war injuries." Supplemental (Suppl.) R. at 1. In a letter dated December 1993, Dr. Gerety wrote:

> In 1961 I was the Dobbin family doctor and treated Mr. William Dobbin for acute gout. The progression of his disease convinced me it was related to the lead present in his shattered elbow, injured in the Korean War. The history of his disease in the ensuing years makes me even more certain today that he suffered from lead poisoning.

SR. at 2.

In July 1994, the VARO granted the appellant's claim for service connection for the cause of the veteran's death due to lead intoxication from shell fragments in his elbow. DIC was awarded effective April 1, 1993, the date her claim was reopened. In December 1996, the Board determined that the appellant was not entitled to an effective date earlier than April 1, 1993, for the payment of DIC benefits. In addition, the Board noted that the appellant's motion for reconsideration of the Board's June 1990 decision was denied in September 1995, and that an appeal to the Court was

4

dismissed for lack of jurisdiction. Therefore, the Board found that its 1990 Board decision was not subject to review for CUE and that the 1988 VARO decision had been subsumed by the 1990 Board decision and, therefore, could not be attacked collaterally on the basis of CUE.

In May 1998, the Court affirmed the December 1996 Board decision in part and vacated it in part and remanded the matter for re-adjudication. The Court affirmed the Board's determination that the 1988 VARO decision was not subject to collateral attack. It vacated the Board's decision that the 1990 Board decision was not subject to review for CUE and remanded the case for re-adjudication of the CUE claim.

On appeal, the Board determined that its June 20, 1990, decision that denied DIC benefits pursuant to the provisions of 38 U.S.C.A. § 1151 did not contain CUE. The Board determined that the June 1990 decision of the Board was supported by and consistent with the evidence then of record.

## II. ANALYSIS

"Previous determinations which are final and binding . . . will be accepted as correct in the absence of clear and unmistakable error." 38 C.F.R. § 3.105(a) (2001). To establish CUE, "[e]ither the correct facts, as they were known at the time, were not before the adjudicator or the statutory or regulatory provisions extant at the time were incorrectly applied." *Russell v. Principi*, 3 Vet.App. 310, 313 (1992) (en banc). The appellant cannot merely disagree as to how the facts were weighed or evaluated. *Id*. The standard for this Court's review of a Board decision on the existence of CUE in a final Board adjudication is limited to whether the Board decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." 38 U.S.C. § 7261(a)3(A). The scope of review under the "arbitrary and capricious" standard is narrow, and a court is not to substitute its own judgment for that of the agency. If the Board articulates a satisfactory explanation for its decision, "including a rational connection between the facts found and the choice made, the Court must affirm." *Jordan v. Brown*, 10 Vet.App. 171, 175 (1997).

In the decision on appeal, the Board found that at the time of the June 1990 decision, the record did not contain any evidence that linked the veteran's death to his in-service left elbow gunshot wounds. The Board stated that:

5

There was no medical opinion implicating the veteran's wound residuals, specifically retained metallic bodies, to the development to rheumatoid arthritis. The medical literature provided to the Board did mention various complications of lead poisoning including renal failure. However, Dr. Ogden did state that he knew of no[] way to link changes from the gunshot wound to the veteran's death.

R. at 17. The evidence before the Board at the time of its 1990 decision consisted of the appellant's lay statements, the medical articles relating lead poisoning to the development of arthritis, a newspaper article concerning the November 1985 death of one patient and illness of five other patients at the Tucson VAMC due to contaminated water, and a statement from the veteran's treating physician that he knew of no way to link the veteran's gunshot wounds to his death. It is clear that the Board in 1990 analyzed the credibility and probative value of the evidence it had before it, and provided adequate reasons and bases for its rejection of any material favorable to the appellant. *See Caluza v. Brown*, 7 Vet. App. 498, 506 (1995). In addition, the Board decision here on appeal also provided adequate reasons and bases as to why the appellant's arguments did not establish CUE. Therefore, since the appellant has not demonstrated that the Board committed error in its findings of fact, conclusions of law, compliance with procedural requirements, or articulation of reasons or bases, the Board's decision must be affirmed and the appellant's motions for oral argument and for sanctions must be denied.

The Court notes that the Veterans Claims Assistance Act of 2000, Pub. L. No. 106-475, 114 Stat. 2096, [hereinafter VCAA], was enacted on November 9, 2000. However, the Court finds that the VCAA has no applicability in this case. *See Livesay v. Principi*, 15 Vet. App. 165 (2001) (en banc) (although the VCAA, with its expanded duties, is potentially applicable to a great number of claims, it is not applicable to CUE.)

### III. CONCLUSION

After consideration of the appellant's brief, the Secretary's brief, and the record, the Court holds that the appellant has not demonstrated that the Board committed either legal or factual error which would warrant reversal or remand. Accordingly, the Board decision is AFFIRMED.