# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 01-2030

LANIER V. HINES, APPELLANT,

v.

ANTHONY J. PRINCIPI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued  January 15, 2004  Decided    August 17, 2004)

*Howard M. Sanders*, of Columbus, Ohio, for the appellant.

*Rebecca L. Ahern Baird*, with whom *Tim S. McClain*, General Counsel; *R. Randall Campbell*, Assistant General Counsel; and *Carolyn F. Washington*, Deputy Assistant General Counsel, all of Washington, D.C., were on brief, for the appellee.

Before KRAMER, *Chief Judge*, and STEINBERG and GREENE, *Judges*.

STEINBERG, *Judge*, filed the opinion of the Court. KRAMER, *Chief Judge*, filed a dissenting opinion.

STEINBERG, *Judge*:  The appellant, through counsel, seeks review of an August 24, 2001, Board of Veterans' Appeals (Board or BVA) decision that concluded that there was no clear and unmistakable error (CUE) in a June 17, 1976, Department of Veterans Affairs (VA) regional office (RO) decision that had denied VA service connection for hy*po*thyroidism.  Record (R.) at 1-30.  The appellant and the Secretary each filed a brief, and the appellant filed a reply brief.  This appeal is timely, and the Court has jurisdiction pursuant to 38 U.S.C. §§ 7252(a) and 7266(a).  For the reasons set forth below, the Court will vacate the Board decision and remand the matter for further development and readjudication.

## I. Relevant Background

The appellant had qualifying service in the U.S. Army Reserves from May 1975 to March 1976. R. at 33. In a December 1974 preservice clinical evaluation report, an examiner checked the "normal" box next to "endocrine system" (R. at 35) and the appellant, in responding to the question "Have you ever had or have you now" such a condition, checked the "No" box next to "thyroid trouble"; the appellant also reported that he was in "[e]xcellent [h]ealth" (R. at 37).

The appellant was diagnosed in service as having thyrotoxicosis in June 1975 (R. at 50); that same month, he was admitted to Brooke Army Medical Center (Brooke AMC) and diagnosed as having, inter alia, hy*per*thyroidism and Graves' disease; these conditions were the primary basis for his admission (R. at 173). ("Thyrotoxicosis" is "the condition caused by excessive quantities of thyroid hormones." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1711 (28th ed. 1994) [hereinafter DORLAND'S]. "Hy*per*thyroidism" is "a condition caused by excessive production of ionated thyroid hormones and marked by goiter, tachycardia or atrial fibrillation, widened pulse pressure, palpitations, fatigability, nervousness and tremor, heat intolerance and excessive sweating, warm, smooth, moist skin, weight loss, muscular weakness, hyperdefecation, emotional lability, and ocular signs." DORLAND'S at 802 (emphasis added).) In a July 1975 VA examination report, the examiner noted that the appellant "has obvious hy*per*thyroidism historically, clinically, and by lab studies." R. at 72 (emphasis added). After the appellant was hospitalized for 51 days at Brooke AMC, an August 1975 discharge summary included an examiner's note that "[t]he patient was in his usual state of health until approximately one year prior to admission when he began to note weight loss despite adequate food intake, approximately 19 pounds over the past year"; for approximately two months prior to admission, he had experienced "the onset of increasing nervousness [and] pounding heart beat"; and for approximately six months before hospital admission he had experienced heat intolerance; the examiner also stated that the appellant's mother had experienced "'thyroid trouble'". R. at 56. The discharge summary diagnosed the appellant as having "[h]y*per*thyroidism [(emphasis added)], Graves' disease", which was treated with Iodine-131 (I-131). R. at 58. (I-131 is "a radioactive isotope of iodine . . . most commonly used in the treatment of both benign and malignant disease of the thyroid gland." DORLAND'S at 1045, and Graves' disease is a

"disorder of the thyroid . . . characterized by at least two of the following: [H]y*per*thyroidism, goiter, and exophthalmos." DORLAND'S at 482 (emphasis added).)

In a November 1975 service medical record (SMR), the examiner noted that the appellant had symptoms of face puffiness, decreased energy, constipation, and dry skin and stated that he had hy*po*thyroidism secondary to his I-131 medication (R. at 185); that same month an examiner diagnosed the appellant as "[f]ound to be hy*po*thyroid now as suspected" (R. at 186) (emphasis added). (It is unclear whether the same examiner made both sets of notes.) ("Hy*po*thyroidism" is "deficiency of thyroid activity. In adults, it is most common in women and characterized by decrease in basal metabolic rate, fatigue and lethargy, [and] sensitivity to cold." DORLAND'S at 811 (emphasis added).) A provisional diagnosis in January 1976 on an SMR consultation sheet noted that he had hy*po*thyroidism, secondary to his hy*per*thyroid treatment. R. at 194. An SMR entry in early February 1976 reported symptoms of lethargy and fatigue and that the appellant was on "Synthroid". (Synthroid is "a preparation of levothyroxine sodium" that is prescribed for "reduced or absent thyroid function". Dorland's at 918, 1649.) *Ibid*. Also, in a February 1976 SMR, an examiner checked the "abnormal" box next to the clinical evaluation for "endocrine system" (R. at 199) and indicated that the appellant's hy*per*thyroidism was "controlled" and that he was currently diagnosed as having hy*po*thyroidism (R. at 200). A March 1976 SMR indicated that his thyroid studies yielded results within normal limits. R. at 217. That same month, he submitted to a VARO a VA compensation and pension (C&P) application for "[h]yperactive thyroid condition [with] residuals of nuclear radiation". R. at 242. A May 1976 VA C&P examination report of the appellant included a diagnosis of "normal" for the general medical examination except for hy*po*thyroidism. R. at 254-55.

In a June 17, 1976, RO decision, the decision being collaterally attacked in this appeal, the RO considered the appellant's claim for service connection for "hyperactive thyroid condition [with] residuals of nuclear radiation", and "determine[d] that the evidence of record indicate[d] that his thyroid condition pre[]existed service and was not aggravated, but actually improved in service with treatment", and denied service connection for hy*po*thyroidism. R. at 259. On July 7, 1976, he submitted a statement regarding that June 1976 RO decision and VA construed it as a Notice of Disagreement (NOD); he stated that his hy*po*thyroidism had begun in service and that he "would like

3

this rating appealed" because his hy*po*thyroidism medication (apparently referring to Synthroid) was expensive. R. at 261. The RO issued a Statement of the Case (SOC) in July 1976 concluding that "service connection for hy*po*thyroidism is not established" and citing as pertinent laws and regulations only 38 U.S.C. §§ 310 and 331 and 38 C.F.R. § "3.306(B)", and describing that regulation as providing that "[a]ggravation may not be conceded where the disability underwent no increase in severity during service on the basis of all the evidence of record pertaining to the manifestations of the disability prior to, during[,] and subsequent to service." R. at 266 (emphasis added). It appears that the appellant did not submit a Substantive Appeal as to the June 1976 RO decision. R. at 272.

In September 1981, the appellant sought to have his claim reopened (R. at 280); however, that same month, the RO confirmed its previous denial of service connection for the appellant's hy*po*thyroidism (R. at 283). A year later, he again notified the RO that he wanted to have his claim reopened (R. at 207), and, subsequently, a January 1983 decision confirmed the previous decision declining to reopen his claim (R. at 302). After he submitted an NOD, the RO stated in a March 1983 SOC that the claim to reopen had been denied because, inter alia, there was "no evidence that the condition was aggravated beyond the natural progress of the disease by the appellant's service." R. at 310-11. In the SOC, the RO cited specifically to "38 C.F.R. § 3.306(B)(1)", describing that regulation as providing that "[t]he usual effect of medical and surgical treatment in service, having the effect of ameliorating diseases or other conditions incurred before enlistment, including poorly functioning parts or organs, will not be considered service connected unless disease or injury is aggravated in service." In an April 1983 Substantive Appeal, the appellant stated that he "was in worse medical condition when [he] left the service" after being "free of any major d[i]sease most of [his] life up until [his] internment in the military." R. at 313.

In an October 1983 BVA hearing, the appellant testified under oath that he disagreed with the previous characterization of his symptoms; he stated that he had experienced symptoms of nervousness because military service "was a big jump" for him and that he had experienced heat intolerance because of a heating situation in his apartment. R. at 364. In response to questions by the hearing officer, he agreed that his two main contentions were (1) that his SMRs mischaracterized the facts and (2) that he had not had a thyroid condition before service. R. at 366. A December 1983

4

BVA decision remanded to the RO his claim for service connection to obtain his complete medical and military personnel records and to schedule him for a VA examination "to determine the nature, extent, and current diagnosis of all residuals of treated hy*per*thyroidism." R. at 381-82 (emphasis added). The RO then issued, in October 1984, a Supplemental SOC (SSOC) explaining that a previous RO decision issued that same month (*see* R. at 446-47) had denied service connection for a thyroid condition on the ground that medical treatment reports "confirm the history, taken at the time, of symptomatology of the thyroid condition pre[]existing entry into military service[; n]o aggravation beyond a normal progression of the disease was shown." R. at 385.

An October 1984 RO decision denied service connection for hy*po*thyroidism and stated that the appellant was "euthyroid at time of separation." R. at 447. ("Euthyroid" indicates the presence of "normal thyroid gland function." DORLAND'S at 588.) A March 1985 BVA decision denied service connection for "residuals of treated hy*per*thyroidism" because new and material evidence had not been submitted to reopen the June 1976 RO decision. R. at 458-59 (emphasis added). On reconsideration in March 1986, the Board confirmed that decision. R. at 484. In an October 1988 letter to the RO, the appellant requested that his service-connection claim be reopened and submitted letters from laypersons regarding his good health at the time of enlistment. R. at 486, 490-96. In January 1989, the RO determined that these letters were not "sufficient" to reopen his claim. R. at 500. In a February 1991 SOC, the RO further explained that because "standard medical textbooks indicate that although the clinical presentation of hy*per*thyroidism may be highly variable, it frequently follows a clear pattern, [and] the statements of the various persons, including the [appellant]'s parents, that he had no serious or unusual illnesses before service, do not present any new facts not already considered." R. at 520 (emphasis added).

In April 1991, the RO received from the appellant a copy of an October 1990 letter from Dr. Francis Greenspan to the appellant and a copy of a letter from Dr. Jose Galindo, Jr., to Dr. Marvin Siperstein, Chief of the Metabolic Section at a VA Medical Center. R. at 527-30. Dr. Galindo discussed hy*per*thyroidism generally, including an observation that hy*per*thyroidism may stem from "some type of stress be it emotional or physical", but stated that he could not "really comment on your case", and he apparently never examined the appellant. R. at 527. Dr. Greenspan examined the appellant and diagnosed him as having "Graves' disease, treated with radioactive iodine with

excellent result" and "[p]ost[]radiation hy*po*thyroidism"; he noted: "I think there is no question that this patient developed his Graves' disease while he was in the service; he was treated extremely well, has had an excellent response, but will require I-thyroxine therapy and periodic monitoring of blood tests for the rest of his life." R. at 528-29 (emphasis added). Dr. Greenspan further stated that the appellant had "a strong genetic pre-disposition to the disease, as evidenced by the positive family history" in his background. R. at 529.

In a June 1991 decision, the RO confirmed the October 1984 RO denial of service connection; the RO noted that "[t]he opinion [of Dr. Greenspan] that the [appellant]'s condition began in service is not supported by the facts" because the appellant had himself stated in June 1975 that he had a "one[-]year history of progressive symptoms". R. at 550. At a February 1992 BVA hearing, the appellant testified under oath that he had been in good health before entering service. R. at 604. He agreed that he had acquired hy*po*thyroidism because of the medication he was taking for his hy*per*thyroidism. R. at 606. He stated that in August 1975 the doctors had "manipulated" his symptoms at the time that he was diagnosed as having Graves' disease; he stated that he had intentionally lost 20 pounds, that any nervousness he had had was related to entering service for the first time, that he had not had a pounding heartbeat, and that his intolerance to heat manifested itself because he had been situated too close to a heating vent. R. at 613.

In May 1993, the Board denied service connection for a thyroid disorder. R. at 631. The Board noted that "the medical evidence from [the appellant's] period of active[-]duty[-]for[-]training service that is available clearly demonstrates that his thyroid disorder had been manifested prior to his entrance into active[-]duty[-]for[-]training service." R. at 628. The appellant appealed to this Court, and in May 1995 the parties filed a joint motion for remand; they requested that the Court vacate the May 1993 BVA decision and remand for "further development and readjudication of the [a]ppellant's claim". R. at 636. The Court, by an order of the Clerk of the Court, granted the joint motion that same month. R. at 648. In October 1995, the Board (1) reopened the appellant's claim for service connection for a thyroid disability after concluding that new and material evidence had been presented in the form of statements regarding his good health before service and medical statements from two private physicians, (2) remanded the case to the RO to afford him a

6

comprehensive medical examination, and (3) directed the RO, following the examination, to review his service-connection claim in light of the entire record.  R. at 656-58.

In a January 1996 VA medical report, the examiner, Dr. Siperstein, stated that the appellant was "both chemically and clinically euthyroid" with his medication.  R. at 666.  He further noted (1) that "[f]rom the history obtained on admission to [Brooke AMC], there is little question that the patient in fact did have some of the typical symptoms of hy*per*thyroidism prior to his induction into the service" (R. at 667 (emphasis added)) and (2) that the appellant's hy*per*thyroid condition "clearly did worsen to the point of being clinically apparent shortly after induction into the Army" (R. at 668). Dr. Siperstein also stated that "as a direct result of the iodine treatment the appellant became hy*po*thyroid, . . . remained hy*po*thyroid for the past 20 years and no doubt will continue to be hy*po*thyroid for the rest of his life" and concluded that "[t]here is no other reasonable explanation for the patient's 20 years of hy*po*thyroidism other than the treatment, albeit appropriate, which he received during his Army service."  R. at 668 (emphasis added).  Dr. Siperstein opined that "by the usual standards in such cases[, the appellant] has a service[-]connected disability, i.e., hy*per*thyroidism worsening to the point of diagnosis in service, plus a condition induced by treatment in service, i.e. hy*po*thyroidism."  R. at 669 (emphasis added).

A February 1996 RO decision awarded the appellant service connection for hy*po*thyroidism that "existed before service but was aggravated by service" and assigned a 10% rating, effective from October 24, 1988, the date that his claim was reopened.  R. at 673-75.  In August 1996, the BVA Senior Deputy Vice Chairman denied the appellant's May 1996 construed motion for reconsideration of (1) the March 1985 BVA decision and (2) the March 1986 BVA reconsideration decision that had concluded that new and material evidence had not been presented to reopen the appellant's claim for service connection for residuals of treated hy*per*thyroidism.  R. at 689.

In an April 1997 decision, the RO concluded that there was no CUE in the June 1976 RO decision; the appellant had argued, inter alia, that the decision contained CUE because the RO had failed to consider the presumption of soundness, aggravation, and all the evidence that was in the record at that time.  R. at 699.  On appeal again, the Board found in April 1999 that there was no CUE in the June 1976 RO decision and that the appellant had essentially argued against "how the RO weighed the extant evidence".  R. at 819.  The appellant appealed the BVA decision, and on

November 30, 2000, the Court vacated the April 1999 BVA decision and remanded the CUE matter because the Board's deficient analysis was "not in compliance with either 38 U.S.C. § 7104(d)(1) or § 7261(a)(3)(A)"; the Court concluded, inter alia, (1) that the lay reports submitted by the appellant did not demonstrate the preexistence of hy*po*thyroidism, (2) that there was no medical evidence in the record showing that the preexistence of hy*per*thyroidism "implies the preexistence" of hy*po*thyroidism, and (3) that the Board's statement of reasons or bases was inadequate. *Hines v. Gober* (*Hines I* ), No. 99-1379, 2000 WL 1771071, at \*4 (Vet. App. Nov. 30, 2000) (single-judge decision).

In the August 2001 BVA decision here on appeal, the Board determined that the 1976 RO decision did not contain CUE. R. at 30. The Board reviewed pertinent regulations in effect as of June 1976. R. at 15-17. Answering the appellant's arguments, the Board then concluded the following: (1) VA's failure to provide an examination was not CUE because the duty to assist cannot constitute grounds for CUE; (2) the RO's failure to consider the May 1975 VA examination was not CUE because the appellant did not specifically assert how the RO's decision would have been different but for that error; and, because prior to February 1990 the RO was not required to summarize the evidence reviewed in making a decision, any omission of evidence from the record before February 1990 did not demonstrate failure to consider evidence of record (citing *Eddy v. Brown*, 9 Vet.App. 52 (1996)); (3) the RO's finding that hy*per*thyroidism preexisted service was not CUE because the presumption of soundness did not apply to the appellant under 38 C.F.R. § 3.1(d), 3.6(a), or 3.304(b) (1975); and (4) a claim that the "RO improperly relied on lay accounts of pre[]service symptoms to establish that hy*per*thyroidism preexisted service, based on Court precedent, cannot constitute a valid CUE theory; R. at 19-24 (emphasis added). The Board then determined that the appellant had presented a valid CUE claim regarding his "allegation that the RO had erroneously based its denial of service connection for hy*po*thyroidism on the circumstances surrounding the history and treatment of his hy*per*thyroidism [and that he] ha[d] sufficiently raised the assertion that the RO did not have the correct facts before it when it made its decision." R. at 24 (emphasis added). The Board nonetheless concluded that, under 38 C.F.R. § 3.306(b)(1) as in effect in 1975, the "usual effects" of medical/surgical treatment in service that ameliorate disease or other conditions incurred before enlistment do not equate to service connection unless the disease/injury

8

is otherwise aggravated by service, 38 C.F.R. § 3.306(b)(1) (1975), and that the RO in 1975, "could arguably", and, apparently, properly, have denied service connection on the basis of that regulation. R. at 27.

## II. Contentions on Appeal

In his brief, the appellant contends that the Court should reverse as clearly erroneous the August 2001 BVA decision or, in the alternative, vacate that decision and remand the matter because the Board did not provide an adequate statement of reasons or bases. Brief (Br.) at 7. He argues that the Board failed to consider 10 U.S.C. § 1219 as implemented by 38 C.F.R. § 3.304(b)(3) regarding "signed statements of appellants relating to the origin, or incurrence of any disease or injury made in service"; he contends that statements made against the interest of an appellant cannot be considered. Br. at 12. In addition, he states that "there was otherwise no competent medical evidence that existed in the record that the appellant had a preexisting thyroid condition." Br. at 11-12. The appellant asserts that, in consideration of these factors, there was CUE in the June 1976 RO decision that denied service connection for hy*po*thyroidism, which had first been diagnosed while the appellant was in service. Br. at 12.

The appellant characterizes the Board's § 3.306(b)(1) "usual effects" discussion as "convoluted" and asserts that hy*per*thyroidism and hy*po*thyroidism are distinct conditions that are assigned "independent" rating codes under 38 C.F.R. § 4.119, Diagnostic Code (DC) 7900, 7903 (2003). Br. at 12. He argues that if the Board had properly applied the presumption of soundness (38 C.F.R. § 3.304(b)(3)), the Board would not have reached the "usual effects" argument because except for the appellant's own statements regarding his symptoms, the record does not include any other evidence that his hy*per*thyroidism preexisted service. Br. at 13. Moreover, he maintains that even if the evidence suggested preexisting hy*per*thyroidism, "there is no competent, independent medical evidence in the record that the 'usual effects' of hy*per*thyroidism treatment lead to hy*po*thyroidism." Br. at 13 (emphasis added). Furthermore, if hy*per*thyroidism preexisted service and hy*po*thyroidism is a "usual effect" of that condition, CUE exists because the appellant was not awarded service connection for hy*po*thyroidism in 1975 and 1976 based on aggravation of that condition, even though his February 1976 separation examination report indicated that he was on

9

medication to control that condition. Br. at 14. The appellant further argues that even though a diagnosis in a March 1976 medical record indicated that his thyroid testing revealed a "normal" condition that does not show that his condition was cured because both hy*per*thyroidism and hy*po*thyroidism are chronic diseases under 38 C.F.R. § 3.309(a). *Ibid.*

In the alternative, the appellant contends that the Board decision should be vacated and the matter remanded for the reasons stated above and because under *Colvin v. Derwinski*, 1 Vet.App. 171, 175 (1991), the Board decision "should not have been made in the absence of independently obtained medical evidence" (Br. at 14-15), and he challenges the adequacy of the Board's statement of reasons or bases pursuant to 38 U.S.C. § 7104(d)(1) (Br. at 15).

The Secretary argues initially that the appellant has abandoned, by not raising on appeal, certain CUE claims – including hy*po*thyroidism as a chronic disease, failure to rate skin and heart conditions, failure to consider a medical record from May 1975, and failure to provide an examination. Br. at 2. The Secretary asserts that the Court should affirm the August 2001 BVA decision because that decision properly concluded that (1) the June 1976 RO decision did not contain CUE, (2) the appellant's hy*per*thyroidism preexisted service, (3) the presumption of soundness did not apply because the appellant was not a "veteran", and (4) the June 1976 decision's denial of service connection for hy*po*thyroidism was not an "undebatable" error, and that, therefore, the Board's decision was not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law". Br. at 6,10. As to the appellant's alternative argument, the Secretary argues that the Board provided an adequate statement of reasons or bases. *Ibid.*

The Secretary also contends (1) that the Board reviewed the evidence before the RO at the time of its June 1976 decision, including the appellant's SMRs, a May 1976 VA examination report, and the appellant's description of his symptoms as set forth in the August 1975 discharge summary (Br. at 7); and (2) that, despite the Court's holding in its November 2000 decision regarding lay observations as unable to establish symptoms, at the time of the June 1976 RO decision, "there was no law precluding the RO from using [the a]ppellant's statements to find that his condition preexisted service" (Br. at 8). The Secretary asserts that the RO in June 1976 "had ample, and allowable evidence to support its determination that [the a]ppellant's thyroid condition preexisted service", and that the appellant's argument that the RO erred by considering his statements in concluding that he

had preexisting hy*per*thyroidism cannot be the basis of CUE because it is a disagreement about weighing the evidence.  Br. at 8-9

The Secretary further contends that none of the evidence before the RO in June 1976 "indicated that [the a]ppellant's hy*per*thyroidism was incurred in or aggravated by service"; the Secretary notes that medical records made after the appellant was treated for hy*per*thyroidism do not address that condition and that the appellant's separation examination report described his hy*per*thyroidism as "'controlled'" while stating that he had hy*po*thyroidism.  Br. at 9.  Regarding § 3.306(b)(1), the Secretary contends that hy*per*thyroidism existed preservice and became "controlled" with I-131 treatment, and that the November 1975 SMR showed that the appellant was "hy*po*thyroid as suspected", all of which supports the "usual effects" of use of I-131.  Br. at 11.  As to the appellant's argument that his statement concerning his preservice symptoms cannot be used to show that he had hyperthyroidism prior to service, the Secretary points out that there is no signed statement by the appellant against his interest and that under *Harris v. West*, 203 F.3d 1347, 1351 (Fed. Cir. 2000), statements from an appellant can serve as medical evidence.  Br. at 13.  As to the appellant's argument that the 1976 RO erred by denying service connection for hy*po*thyroidism based on preservice hy*per*thyroidism, the Secretary asserts that it is "debatable" because the record in June 1976 showed that I-131 hy*per*thyroidism treatment led to hy*po*thyroidism and the RO decision discussed a "hyperactive thyroid condition with residuals of nuclear radiation".  Br. at 15.  Finally, the Secretary argues against a remand on reasons-or-bases grounds because the Board's decision was "complete and articulate with regard to each of its findings".  Br. at 15-16.

In his reply brief, the appellant essentially reiterates the arguments made in his principal brief. In answer to a question from the Court during oral argument on January 15, 2004, the Secretary filed a response stating that in 1975 hy*po*thyroidism in remission warranted a zero-percent rating; he cites to 38 C.F.R. § 4.119, DC 7903 (1975).

### III. Analysis

As an initial matter, the Court notes that the appellant did not raise in his brief the previously submitted CUE claims regarding hy*po*thyroidism as a chronic disease, failure to rate skin and heart conditions, failure to consider a medical record from May 1975, and failure to provide an

11

examination. Therefore, the Court considers these arguments abandoned on appeal. *See Green (Doris) v. Brown*, 10 Vet.App. 111, 114 (1997). The Court also notes that, although the Board discusses the application of the Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (R. at 3-4), the VCAA does not apply to CUE claims. *See Livesay v. Principi*, 15 Vet.App. 165 (2001) (en banc).

Although the appellant submitted an NOD as to the June 17, 1976, RO decision, he did not submit a Substantive Appeal after receiving the July 1976 SOC; we will therefore assume, arguendo (*but see* the discussion at the end of the Analysis regarding the adequacy of that SOC), for the purpose of the CUE claim on appeal, that the June 1976 RO decision became a final decision. *See* 38 U.S.C. § 4005(c) (1970); 38 C.F.R. §§ 3.104, 19.118, 19.153 (1975); *Cuevas v. Principi*, 3 Vet.App. 542, 546 (1992). Such a final decision is a prerequisite for a CUE collateral attack. *See Norris (Robert) v. West*, 12 Vet. App. 413, 422 (holding that prior RO decision that had not become final was not subject to CUE collateral attack). An RO decision that has become final generally may not be reversed or amended in the absence of CUE. *See* 38 U.S.C. § 5109A (codifying into law VA regulation 38 C.F.R. § 3.105(a), *infra*); 38 C.F.R. § 3.105(a) (2000); *see also* 38 U.S.C. §§ 5108, 7105(c); *cf.* 38 C.F.R. § 3.400(q)(2) (2000) (providing that when previously disallowed claim is reopened and allowed on basis of new and material evidence in form of service department records, effective date is date such disallowed claim was filed). Section 3.105(a) of title 38, Code of Federal Regulations, provides:

> Where evidence establishes [CUE], the prior decision will be reversed or amended. For the purpose of authorizing benefits, the rating or other adjudicative decision which constitutes a reversal of a prior decision on the grounds of [CUE] has the same effect as if the corrected decision had been made on the date of the reversed decision.

38 C.F.R. § 3.105(a). The CUE claim presented here is a collateral attack on a final RO decision. *See Crippen v. Brown*, 9 Vet.App. 412, 418 (1996); *see also Fugo v. Brown*, 6 Vet.App. 40, 44 (1993).

In *Russell v. Principi*, the Court defined CUE as follows:

> Either the correct facts, as they were known at the time, were not before the adjudicator or the statutory or regulatory provisions extant

> at the time were incorrectly applied. . . . [CUE is] the sort of error which, had it not been made, would have manifestly changed the outcome . . . [, an error that is] undebatable, so that it can be said that reasonable minds could only conclude that the original decision was fatally flawed at the time it was made.

*Russell*, 3 Vet.App. 310, 313-14 (1992) (en banc); *see also Bustos v. West*, 179 F.3d 1378, 1380 (Fed. Cir. 1999) (expressly adopting the "manifestly changed the outcome" language in *Russell*, *supra*). "A determination that there was a '[CUE]' must be based on the record and the law that existed at the time of the prior . . . decision." *Russell*, 3 Vet.App. at 314. "In order for there to be a valid claim of [CUE], . . . [t]he claimant, in short, must assert more than a disagreement as to how the facts were weighed or evaluated." *Id*. at 313; *see also Damrel v. Brown*, 6 Vet.App. 242, 245 (1994). Moreover, a CUE claim must identify the alleged error(s) with "some degree of specificity". *Crippen*, 9 Vet.App. at 420; *Fugo*, 6 Vet.App. at 44 ("to raise CUE there must be some degree of specificity as to what the alleged error is and . . . persuasive reasons must be given as to why the result would have been *manifestly* different").

Russell also established that, as a threshold matter, a CUE claim cannot be raised for the first time before this Court but that the claim must have been the subject of a final prior BVA adjudication. *Russell*, 3 Vet.App. at 314-15. Furthermore, when the Court considers a Board determination that there was no CUE in a prior final RO decision, the Court's review is limited to deciding whether that Board conclusion is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", 38 U.S.C. § 7261(a)(3)(A); *see Dobbin v. Principi*, 15 Vet.App. 323 (2001) (discussing arbitrary and capricious standard as applied to CUE claims); *Damrel*, *supra*, and whether it is supported by an adequate statement of "reasons or bases", 38 U.S.C. § 7104(d)(1). *See Beyrle v. Brown*, 9 Vet.App. 377, 382 (1996); *see also Russell*, 3 Vet.App. at 315; *Eddy v. Brown*, 9 Vet.App. 52, 57 (1996). The Board's written statement of reasons or bases must address its findings and conclusions on all material issues of fact and law presented on the record and must be adequate to enable an appellant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990).

In its decision, the Board, in essence, conceded one of the errors asserted by the appellant as to the 1976 RO decision but found that the 1976 RO decision could have had another, unstated basis

for not awarding service connection for hy*po*thyroidism (R. at 257, 259). That basis was the application of the "usual effects" clause in 38 C.F.R. § 3.306(b)(1), which provided in 1976 as to aggravation of a preexisting condition:

> (1) The usual effects of medical and surgical treatment in service, having the effect of ameliorating diseases or other conditions incurred before enlistment, including postoperative scars, absent or poorly functioning parts or organs, will not be considered service connected unless the disease or injury is aggravated by service.

38 C.F.R. § 3.306(b)(1) (1975).

Specifically, the Board reasoned:

> In denying service connection for hy*po*thyroidism, the RO appeared to rely on the facts pertaining to hy*per*thyroidism and its existence prior to service. It's [sic] findings revolved around a discussion of the pre[]service symptoms of hy*per*thyroidism. The RO went on to use its findings that the "thyroid condition" or hy*per*thyroidism preexisted and was not aggravated by service to justify its denial of hy*po*thyroidism.
>
> The above rationale, viewed in a vacuum, could potentially be viewed as error, insofar as the RO appeared to rely on the finding that one disorder (hy*per*thyroidism) preexisted service in order to deny service connection for another separate disorder, hy*po*thyroidism, and implicitly conclude that it too preexisted service. ***The Board agrees that such a determination would be erroneous.***
>
> However, it is debatable as to whether this was in fact the basis of the RO's denial of service connection of hy*po*thyroidism in light of the evidence and regulations of record which indicate another possible valid basis of the RO's denial. *Russell, supra*. That is, the evidence and regulations of record, read in conjunction with the rationale of the June 1976 decision, leaves it open to debate ***as to whether the RO***, rather than finding that hy*po*thyroidism preexisted service, ***treated the disability as a "usual effect" of treatment of the claimed hyperactive thyroid condition.***
>
> First, the issue in the June 1976 rating decision was service connection for a "***hyper***active thyroid condition with *residuals of nuclear radiation*." (emphasis added).

14

Second, [SMR]s consistently documented that hy*po*thyroidism was secondary to I-131 treatment for hy*per*thyroidism.

Third, [SMR]s document that the veteran's hy*per*thyroidism resolved with treatment.

Fourth, extant regulations provided that the **usual effects** of medical and surgical treatment in service, having the effect of ameliorating disease or other conditions incurred before enlistment, including postoperative scars, absent or poorly functioning parts or organs, will not be considered service connected unless the disease or injury is otherwise aggravated by service. 38 C.F.R. § 3.306(b)(1) (1975) (emphasis added).

The above demonstrates that it is debatable **as to whether the RO based its denial** on the erroneous determination that hy*po*thyroidism preexisted service, or that the RO committed error in denying service connection for hy*po*thyroidism based on its finding that hy*per*thyroidism preexisted and was not aggravated by service (i.e., that there is no rational connection between the determination that hy*per*thyroidism preexisted service and the denial of hy*po*thyroidism).

It is debatable because it could be argued, based on the above-listed evidence, **that the RO decision was based** on a finding that the veteran's hy*per*thyroidism preexisted and was not aggravated by service, and that service connection for hy*po*thyroidism **was denied** based on that fact that it was a "usual effect" of the treatment of hy*per*thyroidism (pursuant to section 3.306(b)(1)), rather than a preexisting disease that was not aggravated by service.

**This interpretation of the RO's determination** is supported by its framing of the issue as being service connection for a hyperactive thyroid condition *with residuals of nuclear radiation*, and by its determination that the *thyroid condition*, as opposed to the residuals of nuclear radiation (which the [SMR]s have noted as being hypothyroidism), preexisted service.

Further, such a rationale is not without support in the available evidence of record. In this regard, the Board notes that following treatment for hypothyroidism, the [appellant] had been found to be hy*po*thyroid, "as suspected." Further, [SMR]s specifically document on multiple occasions that hy*po*thyroidism was secondary to I-131 treatment of hy*per*thyroidism.

15

In sum, the Board finds that the veteran's claim that the RO erroneously relied on the determination that hy***per***thyroidism preexisted service to deny service connection to hy***po***thyroidism does not constitute CUE.

This is because the evidence indicates, at the very least, the possibility ***that the RO only found*** the veteran's hy***per***thyroidism, not hy***po***thyroidism, preexisted and was not aggravated by service. Further, pursuant to the extant regulation, section 3.306(b)(1), the RO could arguably have denied service connection for hy***po***thyroidism because it was a usual effect of the treatment for the preexisting thyroid condition that was not aggravated by service.

Thus, the Board finds that the RO's June 1976 . . . decision leaves open for the debate as to whether its denial of service connection for hy***po***thyroidism based on a determination that hy***per***thyroidism preexisted service was CUE. Therefore, this theory of CUE must fail because the alleged error is debatable. *Russell, supra*.

The Board stresses that it is not making its own finding or conclusion that hy***po***thyroidism was or was not a usual effect of treatment for hy***per***thyroidism, or that the evidence otherwise demonstrated that it preexisted service. This would be impermissible. *Colvin* [,1 Vet.App. at 175]. The Board merely finds that ***the evidence (including competent evidence) supports another interpretation of the RO's denial that would not be erroneous, i.e., be justified by the regulations.*** As a result, the veteran's alleged error is debatable.

R. 24-27 (boldface italic emphasis added). The foregoing emphasized language shows that the Board found that the RO might actually have based its 1976 denial on § 3.306(b)(1).

First, we must accept that the Board's finding that except for the possibility of the application of the § 3.306(b)(1) "usual effects" clause the RO would have erred in "rely[ing] on the finding that one disorder (hy***per***thyroidism) preexisted service in order to deny service connection for another separate disorder, hy***po***thyroidism, and implicitly conclud[ing] that it too preexisted service." R. at 25. This Court cannot controvert findings made by the Board that are not adverse to the appellant. *See* 38 U.S.C. § 7261(a)(4) (as amended by theVeterans Benefits Act of 2002 Pub. L. No. 107-330, § 401, 116 Stat. 2820, 2832 (Dec. 6, 2002) (providing for Court to reverse or set aside only findings of fact "adverse to the claimant")); *Roberson v. Principi*, 17 Vet. App. 135, 138 (2003) (per

curiam order); *see also Nolen v. Gober*, 222 F.3d 1356, 1360-1361 (Fed. Cir. 2000) (holding that once Secretary determined that claim was well grounded it was improper for this Court to reconsider matter). Moreover, we hold that the conceded RO error (using the preexistence of hy*per*thyroidism to deny service connection for hy*po*thyroidism) had it not been committed, and in the absence of a viable application of the § 3.303(b)(1) "usual effects" theory, would have resulted in a changed outcome – that is, service connection for hy*po*thyroidism would have been awarded because there was no evidence as of 1976 that *that* condition had preexisted the appellant's service. *See Russell, supra; see also Crippen*, *Damrel,* and *Fugo,* all *supra*. Indeed, this was one of the holdings in the Court's November 30, 2000, decision, *Hines I*, 2000 WL 1771071, at *4, and that determination is the law of the case. *See Augustine v. Principi*, 343 F.3d 1334, 1339 (Fed. Cir. 2003) (law-of-the-case doctrine applies to legal issue on question [that] has actually been decided "in earlier stage of the litigation" on which "final judgment" has been entered); *Intergraph v. Intel*, 253 F.3d 695, 699 (Fed. Cir. 2001) (under law-of-the-case doctrine, court of appeals is generally "bound by findings" "made by court of appeals in a prior appeal of the same case") (quoting *Ellard v. Ala. Bd. of Pardons and Paroles*, 928 F.3d 378, 381 (11th Cir. 1991)).

Before proceeding further we reject the appellant's argument that if the RO and the Board had properly applied 38 C.F.R. § 3.304(b)(3) (1975), regarding veterans' signed statements that contradict the presumption of soundness, then the "usual effects" argument would never have to be reached. Basic entitlement to compensation for veterans for service-connected disabilities in 1976 derived from 38 U.S.C. § 310 (now § 1110), which provided in pertinent part:

> For disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the *active military, naval, or air service* . . . the United States will pay to any *veteran* thus disabled . . . compensation as provided in this subchapter . . . .

38 U.S.C. § 310 (1970) (emphasis added). The term "veteran" was defined, in relevant part, as "a person who served in the active military, naval, or air service." 38 U.S.C. § 101(2); *see also* 38 C.F.R. § 3.1(d) (1975). The term "active military, naval, or air service" was defined to include, inter alia, "any period of active duty for training *during which* the individual concerned was *disabled or died from a disease or injury incurred or aggravated in line of duty."* 38 U.S.C. § 101(24)

17

(emphasis added); *see also* 38 C.F.R. § 3.6(a) (1975). An individual who has served only on active duty for training must establish a service-connected disability in order to achieve veteran status. *See Paulson v. Brown*, 7 Vet.App. 466, 470 (1995); *see also Mercado-Martinez v. West*, 11 Vet.App. 415, 419 (1998). Under 38 U.S.C. § 311 (now § 1111), a veteran was afforded a presumption of sound condition upon entry into service, except for any defects noted at the time of examination for entry into service. In this case, the appellant was not a "veteran" at the time of the RO's adjudication in 1976 because his service was active duty for training and he had not established a service-connected disability in order to achieve veteran status. *See Paulson* and *Mercado-Martinez*, both *supra*. The presumption of soundness thus did not attach, and any assertion that the 1976 RO failed to apply it cannot constitute CUE.

We thus return to the Board's hypothesis that the RO decision denying service connection for hy*po*thyroidism could reasonably be interpreted as having been based on a proper application of the "usual effects" clause in § 3.306(b)(1) in 1976. The Board apparently concluded that the 1976 RO could *properly* have found that the usual effects, that is, hy*po*thyroidism, of the in-service surgical treatment of the appellant's hy*per*thyroidism, which treatment had the effect of improving the disease that was incurred before service, should not be considered service connected because the disease was not "otherwise aggravated by service". R. at 26. There are several problems with this analysis. First, although the Board noted that, following treatment for hy*per*thyroidism, the appellant's SMRs documented that he had been found to be hy*po*thyroid, "as suspected," and that the hy*po*thyroidism was secondary to I-131 treatment of hy*per*thyroidism, there does not appear to have been medical evidence in the record in June 1976 that indicated that the "usual effects" of hy*per*thyroidism treatment was hy*po*thyroidism. There *was* medical evidence that the *appellant's* hypothyroidism was secondary to the I-131 treatment, but that does not indicate that it was a "usual effect[]". In any event, the 1976 RO decision made no such finding.

Second, even if we accept that hy*po*thyroidism is a usual effect of hy*per*thyroidism treatment, service connection can still be granted if the condition is "otherwise aggravated by service". 38 C.F.R. § 3.306(b)(1). In this case, it is undisputed on the June 1976 record that the appellant's thyroid condition was aggravated by service. Although the radiation treatment eliminated his hy*per*thyroid condition, and it is now established that that treatment probably led to another condition,

18

hy*po*thyroidism, another disability (*see* R. at 668-69 (Dr. Siperstein's January 1996 report)), there was absolutely no evidence in June 1976 that the appellant had hy*po*thyroidism prior to service and that it was not incurred in service. Hence, the only basis for concluding that hy*po*thyroidism was not service connected would be because it was a § 3.306(b)(1) "ususal effect[]" of the radiation treatment. However, as noted, that provision specifically excepts from its preclusion of service connection "a disease or injury otherwise aggravated by service". 38 C.F.R. § 3.306(b)(1) (1975).

This brings us to the Board's discussion of the hypothetical application of § 3.306(b)(1) by the RO. We hold that that Board discussion is deficient because it does not explain how that regulation would apply to the facts before the RO in June 1976. Many pertinent questions about the potential application of that regulation to the June 1976 evidence of record were not adequately addressed by the Board. For example, in the words of the regulation, the "medical treatment in service" was for hy*per*thyroidism. The "usual effect[]" in the Board's hypothesis would be hy*po*thyroidism. Assuming that there was of record in June 1976 medical evidence on which to base such a "usual effects" determination, how would the last part of the regulation, "unless the disease or injury is otherwise aggravated by service", be applied to the June 1976 evidence of record? First, what is the meaning of "aggravated" in the "unless" clause? Second, at what point in time must the aggravation have occurred – at the time of the treatment, following the treatment, or at separation – and why? Third, to what "disease" does the "unless" clause refer? It is quite unclear whether it is the condition sought to be "ameliorated", hy*per*thyroidism, or the condition that was considered to be the "usual effect[]", hy*po*thyroidism. If the former, then it is clear from the evidence that the appellant's hy*per*thyroidism had been aggravated by service by the time that his June 1975 treatment began and it further appears, based on his 51-day period of in-service hospitalization in June through August 1975 (R. at 56-58), for example, that this may not have been a temporary flareup but rather an increase in the severity of his disease that would have continued without the I-131 treatment then administered. *See Hunt v. Derwinski*, 1 Vet.App. 292, 296 (1991) (noting that presumption of aggravation is not applicable unless preservice disability underwent increase in severity during service).

On the other hand, if the "disease" referred to in the § 3.306(b)(1) "unless" clause is hy*po*thyroidism, then the Board needs to address how it would have been reasonable for the RO to decide that hy*po*thyroidism was not aggravated by service – in view of the fact that in 1996 the RO

19

determined, based on essentially the same evidentiary record that was before the RO in 1976 regarding aggravation of preexisting hy*po*thyroidism, that hy*po*thyroidism "was aggravated by service" (R. at 263). Further, as to the interpretation of "disease or injury" in the "unless" clause, the Board must (1) address which interpretation is the correct one (including whether "disease" can fairly be read in the alternative, that is, to refer to aggravation of *either* the condition being treated *or* the resulting condition, i.e., "the usual effects"), construing interpretive doubt in favor of the claimant, *see Brown v. Gardner*, 513 U.S. 115, 118 (1994); *Allen (Alfred) v. Brown*, 7 Vet.App. 439, 446 (1995) (en banc); and (2) provide adequate reasons for its interpretive conclusion by referring to regulatory history, any opinions of the VA General Counsel, and any policy considerations that the Secretary may have sought to achieve by the promulgation of § 3.306(b)(1). Because the Board failed to address these matters, its statement of reasons or bases for denying the CUE claim was inadequate and remand is required. *See* 38 U.S.C. §7104(d)(1); *Beyrle*, *supra; see also Russell*, *Eddy*, and *Allday*, all *supra*.

There is a further and perhaps more fundamental deficiency in the Board's hypothesizing about the RO's having applied § 3.303(b)(1) in 1976, and that is that the evidence of record strongly suggests that the RO did *not* apply that regulation in 1976. The evidence so suggesting is the content of the 1976 and 1983 SOCs. After the appellant filed an NOD in 1976, the RO issued an SOC, which was then, as now, required to specify the relevant regulations, *see* 38 U.S.C. § 4005(d)(1) (1970) (requiring that agency of original jurisdiction "prepare [an SOC] consisting of . . . [, inter alia,] (A) [a] summary of the evidence in the case pertinent to the issue or issues with which the disagreement has been expressed; [and] (B) [a] citation or discussion of the pertinent law [and] regulations"); 38 C.F.R. § 19.115(b) (1975) (providing that SOC "shall consist of . . .[, inter alia, a] citation or discussion of the pertinent law, [VA r]egulations or other criteria"); that 1976 SOC did not refer to, discuss, or summarize in any way § 3.306(b)(1) (*see* R. at 264-66). In contrast, the 1983 SOC denying the appellant's claim to reopen did specifically refer to § 3.306(b)(1) and specifically summarized the "usual effects" prohibition (R. at 310). Hence, it appears either that the 1976 RO did not, in fact, apply § 3.306(b)(1) or that, if it did, then its SOC is deficient and the June 1976 RO decision might not have become final, given the appellant's timely NOD as to that decision (R. at 261). *See Fenderson v. West*, 12 Vet.App. 119, 132 (1999) (applying *Holland v. Gober*, 10 Vet.App.

20

433, 436 (1999) (per curiam order)). The Board's failure to address these matters in connection with its hypothesis about the application of §3.306(b)(1) by the RO in June 1976 is an additional reasons-or-bases deficiency requiring remand under section 7104(d)(1). *See Beyrle, supra; see also Russell, Eddy*, and *Allday*, all *supra*.

Accordingly, the Court will set aside the Board's decision that it is a reasonable interpretation of the 1976 RO decision that it was based – and could properly have been based – on an application of § 3.306(b)(1). If the Board decides, consistent with the foregoing analysis, that the RO either did not base or could not properly have based its decision in 1976 on an application of § 3.306(b)(1), then the Board must find that that RO decision contained CUE in not awarding service connection for the appellant's hy*po*thyroidism. In that event, the Board must itself, or by remand to an RO, then determine the proper rating for the hy*po*thyroidism at the time of the June 1976 RO decision and subsequently, until the award of service connection in February 1996 (R. at 671-75). Such a determination must take into account the possibility of staged ratings within that 20-year period, *see Fenderson*, 12 Vet.App. at 126, and provide the appellant with all appropriate assistance in developing evidence on the rating question. *See* 38 U.S.C. §5103A; 38 C.F.R. § 3.159(c) (2003); *Proscelle v. Derwinski*, 2 Vet.App. 629, 631 (1992) (concluding that duty to assist applied to veteran seeking higher rating for service-connected disability). Alternatively, if the Board concludes that such an application did occur and would have been proper, the Board must determine, and explain its decision fully, whether the 1976 RO decision is final (as to the effective date assigned to the award of service connection for the appellant's hy*po*thyroidism).

As to the appellant's other contentions, the Court has considered them and does not find that they warrant further review at this time. If appropriate, the appellant is free to raise any such arguments in the remand ordered herein. *See Best v. Principi*, 15 Vet.App. 18, 20 (2001) (per curiam order) (establishing that because of yet-unknown factual and legal context in which claim readjudication will occur, absent "appropriate circumstances" Court will often exercise its discretion not to address each asserted BVA error once it is determined that VCAA remand is warranted; narrow decision preserves opportunity to argue claimed errors before Board at readjudication and before Court on appeal should Board rule adversely). The appellant is, of course, free to pursue these matters on remand. *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002) ("[o]n remand the appellant

21

is free to proffer his arguments to the Board, and the Board must address them"); *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991) (noting that "[t]he Court expects that the BVA will reexamine the evidence of record, seek any other evidence [that] the Board feels is necessary, and issue a timely, well-supported decision in this case").

Finally, regarding our colleague's dissenting opinion, we appreciate his effort to supply an adequate statement of reasons or bases for the Board's decision. This, however, is the Board's responsibility, *see* 38 U.S.C. § 7104(d); *Beryle*, *supra*; *see also Russell* and *Eddy*, both *supra*, not the Court's. Nor do we know the basis for many of the implicit assumptions that seem to be made in the dissenting opinion about the proper interpretation of the § 3.306 regulation.

## IV. Conclusion

Upon consideration of the foregoing analysis, the record on appeal, and the submissions of the parties, the Court vacates the August 24, 2001, BVA decision and remands the matter for expeditious issuance of a readjudicated decision supported by an adequate statement of reasons or bases, *see* 38 U.S.C. §§ 1110, 5109A, 7104(a), (d)(1); 38 U.S.C. § 4005 (d)(1) (1970); 38 C.F.R. §§ 3.105(a), 3.306(b)(1), 4.119; 38 C.F.R. § 19.115(b) (1975); *Fletcher, supra* – all consistent with this decision and in accordance with section 302 of the Veterans' Benefits Improvements Act, Pub. L. No. 103-446, § 302, 108 Stat. 4645, 4658 (1994) (found at 38 U.S.C. § 5101 note) (requiring Secretary to provide for "expeditious treatment" for claims remanded by BVA or the Court). *See Allday*, 7 Vet.App. at 533-34. On remand, the appellant will be free to submit additional evidence (as appropriate in a CUE claim) and argument on the remanded claim, and the Board is required to consider any such evidence and argument. *See Kay*, *supra*. The Court notes that a remand by this Court and by the Board confers on an appellant the right to VA compliance with the terms of the remand order and imposes on the Secretary a concomitant duty to ensure compliance with those terms. *See Stegall v. West*, 11 Vet.App. 268, 271 (1998). A final decision by the Board following the remand herein ordered will constitute a new decision that, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the

date on which notice of the new Board final decision is mailed to the appellant. *See Marsh v. West*, 11 Vet.App. 468, 472 (1998).

VACATED AND REMANDED.


KRAMER, *Chief Judge*, dissenting: Because, for the reasons set forth below, I disagree with the majority's analysis and conclusion that a remand is proper in this clear and unmistakable error (CUE) case, I respectfully dissent.

A prior VA regional office (RO) decision must be reversed or revised where evidence establishes CUE. 38 U.S.C. § 5109A; 38 C.F.R. § 3.105(a) (2003). For CUE to exist either (1) the correct facts in the record were not before the adjudicator or (2) the statutory or regulatory provisions extant at the time were incorrectly applied. *See Damrel v. Brown*, 6 Vet.App. 242, 245 (1994). In addition, "the error must be 'undebatable' and of the sort 'which, had it not been made, would have manifestly changed the outcome at the time it was made.'" *Damrel*, 6 Vet.App. at 245 (quoting *Russell v. Principi*, 3 Vet.App. 310, 313-14 (1992) (en banc)); *see also Bustos v. West*, 179 F.3d 1378, 1380 (Fed. Cir. 1999) (expressly adopting "manifestly changed the outcome" language in *Russell*, *supra*). "In order for there to be a valid claim of [CUE], . . . [t]he claimant, in short, must assert more than a disagreement as to how the facts were weighed or evaluated." *Russell*, 3 Vet.App. at 313. That is because, "even where the premise of error is accepted, if it is not absolutely clear that a different result would have ensued, the error complained of cannot be, ipso facto, clear and unmistakable." *Fugo v. Brown*, 6 Vet.App. 40, 43-44 (1993). On appeal of a Board of Veterans' Appeals (Board or BVA) determination that there was no CUE in a prior final RO decision, the Court's review is limited to determining whether the Board's conclusion is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (38 U.S.C. § 7261(a)(3)(A)) and whether it is supported by an adequate statement of "reasons or bases" (38 U.S.C. § 7104(d)(1)). *See Eddy v. Brown*, 9 Vet.App. 52, 57 (1996); *Damrel*, 6 Vet.App. at 246; *Russell*, 3 Vet.App. at 315; *see also Beyrle v. Brown*, 9 Vet.App. 377, 381-84 (1996); *Mason v. Brown*, 8 Vet.App. 44, 52-53 (1995).

In the instant CUE case, based on the evidence of record in June 1976, the appellant has failed to demonstrate that there could have been CUE in the June 1976 RO decision to deny service connection for hyperthyroidism or hypothyroidism. *See Link v. West*, 12 Vet.App. 39, 45 (1998);

23

*Crippen v. Brown*, 9 Vet.App. 412, 420 (1996) (noting that 38 U.S.C. § 5104(b) was added effective February 1, 1990, to require RO to specify in decision evidence considered and reasons for disposition).

First, there was evidence of record in June 1976 to support the RO's determination that the appellant's hyperthyroidism existed prior to service. *See* Record (R.) at 259 (June 1976 RO decision in which RO had concluded that thyroid condition, inter alia, preexisted service). Specifically, in the August 1975 hospital discharge summary, the physician had stated that the "[then-p]resent [i]llness" (R. at 57) had begun one year prior to the appellant's June 1975 hospital admission, i.e., approximately 11 months prior to the appellant's entry into service (*see* R. at 33). *See Crippen*, *supra*; *Fugo*, 6 Vet.App. at 43-44 ("[I]f it is not absolutely clear that a different result would have ensued, the error complained of cannot be, ipso facto, clear and unmistakable."); *Russell*, 3 Vet.App. at 313-14 (as to requirements of undebatable error and manifest outcome change). Moreover, at the time of the June 1976 RO decision, the RO was not precluded from using its own medical judgment in making its determination, and the Court notes that a medical doctor, inter alia, signed the June 1976 RO decision. *See* R. at 259; *see also Colvin v. Derwinski*, 1 Vet.App. 171, 172 (1991) (to reject expert medical conclusions, Board must have basis other than its own unsubstantiated opinion to support its decision); *Berger v. Brown*, 10 Vet.App. 166, 170 (1997) ("opinions from this Court that formulate new interpretations of the law subsequent to an RO decision cannot be the basis of a valid CUE claim").

Second, under 38 C.F.R. § 3.306(a) as extant in June 1976, a preexisting injury or disease could have been service connected if "there [was] an increase in disability during such service." 38 C.F.R. § 3.306(a) (1975). As to any increase in the appellant's hyperthyroidism, it is not entirely clear from the language of § 3.306(a) (*see Damrel*, 6 Vet.App. at 245 (error must be undebatable)) whether "during such service" meant "must have endured until discharge from service" or "at any point in time during service." Although perhaps not determinative on this issue because it was not in existence at the time of the June 1976 RO decision, this Court's caselaw, at a minimum, is instructive as to any ambiguity that may have existed on this issue. *See Hunt v. Derwinski*, 1 Vet.App. 292, 296-97 (1991) (temporary flare-ups during service of preexisting disease are not sufficient to be considered in-service aggravation unless underlying condition, as contrasted with

24

symptoms, is worsened); R. at 259 (June 1976 RO had concluded that appellant's thyroid condition, inter alia, "was not aggravated [by service], but actually improved in service with treatment").  If establishing an increase in disability under § 3.306(a) required that the disability endure until discharge from service, there was evidence of record in June 1976 to support a determination that the appellant's hyperthyroidism had not so endured.  *See* R. at 200 (February 1976 service discharge examination report on which examiner had indicated, inter alia, that hyperthyroidism was "controlled"); *Fugo* and *Russell*, both *supra*.  Even assuming that, at the time of the June 1976 RO decision, showing an increase in disability under § 3.306(a) did not require that the disability endure until discharge from service, the evidence of record in June 1976 was not necessarily *all* in the appellant's favor as to whether a nonenduring increase had occurred.  *See* R. at 138, 142, 166, 169 (treatment notes during appellant's in-service hospitalization indicating that appellant was out of hospital on passes of varying lengths, including pass for overnight fishing trip), 173 (discharged from hospital to duty); *Crippen*, 9 Vet.App. at 422 (if all evidence at time of RO decision "militated in support of the claim," that could be basis for finding CUE in RO's denial of claim); *see also Fugo* and *Russell*, both *supra*.

Third, as to whether the existence of hypothyroidism either was an aggravation of the appellant's hyperthyroidism or itself was incurred in service, 38 C.F.R. § 3.306(b)(1) as extant in June 1976 provided:

> The usual effects of medical and surgical treatment in service, having the effect of ameliorating disease or other conditions incurred before enlistment, including postoperative scars, absent or poorly functioning parts or organs, will not be considered service connected unless the disease or injury is otherwise aggravated by service.

38 C.F.R. § 3.306(b)(1) (1975).

In this regard, three pieces of evidence before the June 1976 RO could have been construed as indicating that the development of hypothyroidism was a "usual effect[]" (38 C.F.R. § 3.306(b)(1)) of the treatment of the appellant's hyperthyroidism.  *See Fugo* and *Russell*, both *supra*. Specifically, of record in June 1976 were, inter alia, the August 1975 in-service hospital discharge summary in which the examiner had "recommended that [the appellant] be observed for signs of decreasing thyroid activity" (R. at 58); a service medical record (SMR) in which the examiner had indicated that

the appellant's hypothyroidism was secondary to his in-service I-131 treatment (R. at 185; *see* R. at 194 (same effect)); and an SMR in which the examiner had recorded that the appellant's hypothyroidism was "as suspected" (R. at 186). *See Crippen*, 9 Vet.App. at 422; *see also Russell*, 3 Vet.App. at 313 (disagreement with manner in which evidence was weighed is not CUE).

Lastly, other than the evidence described above, there was no other evidence of record in June 1976 to demonstrate that the appellant's hyperthyroidism had been "otherwise aggravated" (38 C.F.R. § 3.306(b)(1)), and the appellant has not presented any authority as to the meaning of that term. *See* R. at 58, 138, 142, 166, 169, 173, 185, 186, 194, 200; *Crippen*, *Fugo*, and *Russell*, all *supra*.

Thus, the Court should conclude that the appellant has not demonstrated that the Board's determination, in the decision on appeal, that there was no CUE in the June 1976 RO decision in which the RO had denied service connection for the appellant's thyroid condition was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 38 U.S.C. § 7261(a)(3)(A); *see Russell*, 3 Vet.App. at 315. Further, given that the appellant has not shown, based on the evidence of record in June 1976, that there could have been CUE in the June 1976 RO decision, any inadequacy in the BVA's statement of reasons or bases for its decision as to this CUE matter would be nonprejudicial because no such CUE claim could have been granted on any of the bases that the appellant has advanced. *See Eddy*, 9 Vet.App. at 58-59 (concluding that "any inadequacy in the Board's statement of . . . reasons or bases for its decision on [the appellant's CUE] claim would be nonprejudicial error because a CUE claim could not have been granted on any of the theories advanced by the appellant"); *see also Link*, *supra*. Finally, as to the interpretive questions regarding 38 C.F.R. § 3.306(b)(1) as extant in June 1976 that the majority has identified (*ante* at 19-20), I would note that, if it is unclear whether an interpretation, which would form the basis for CUE, was correct in 1976, such an interpretation cannot be relied upon to demonstrate CUE. *See Berger*, 10 Vet.App. at 170. Accordingly, the Court should affirm the August 2001 Board decision.